31806 Wigmore, FLM Enterprises, Appellant by Christopher Spanos v. Peoria County Zoning Board of Appeals, Appellee by Melinda Manline and the City of Tula County, Intervenor, Appellee by Danny Schroeder. With due respect. Thank you, Your Honor. Thanks again for allowing us to come up and have this opportunity to address our case. I said yesterday, two days in a row yesterday, I said that I felt like a first year lawyer. I get all excited and butterflies because I don't come up here very often. The truth of the matter is that prior to yesterday I had argued twice. So today and tomorrow I'm doubling my time in 25 years. So I thank you for that opportunity. Well, this courtroom does it to everybody. Does it to everybody? Well, not too much gets me nervous anymore. But I will admit that coming before the appellate court with your procedures gives me just a little bit of concern. Again, let's get to the facts of what's going on here. If you'll indulge me just for a second, I want to hit a couple of what I think are the pertinent facts. First off, I would say that with respect to what we're going to ask you to decide, there are no disputed facts. There really aren't. We had a disputed fact, and that was whether or not this parcel, this nonconforming use certificate had been abandoned. We still contend that it was not. But we lost that at the ZBA based on an affidavit that came in. And the ZBA decided to file the affidavit instead of the rest of the evidence. And the standard on that is manifest weight. And that's a very difficult thing for us to overcome considering the presence of this affidavit. So while we dispute it, we're not going to argue about it. Okay? But what we do argue about and we think is very equally clear is that the county should be stopped and latches should apply in this case. And there is absolutely no question about it. In fact, when you look at what Judge Mack says in his rulings, he goes right down the line with everything we say until he gets to the end. And what he says is because there's evidence that my client's predecessors knew that there has been a gravel pit on this piece of property in the past, they somehow were unreasonable in their reliance upon the county. So let me step back for just one second. What happened here was back in about 2002, my clients decided that they were interested in purchasing this property for the sole purpose of operating a gravel pit. So they entered into an agreement with the current owners with a five-year option to close. Shortly after, one of my client's predecessors, Steve Maxheimer, died in an automobile accident. And then shortly after that, his wife passed away, leaving four orphaned children, some of whom were minors. There was a time where they had to decide, what are we going to do with this? Are we going to invest this money or will that be invested better into a better way to invest this on behalf of the children? Ultimately, the decision was made to proceed with the purchase so long as they could do what they wanted to do on the property. And in order to find out whether or not this existing nonconforming use certificate was still valid, they went to the county and they asked. Now, step back for a second. Prior to this, they were in on another application. They were asking for a nonconforming use on three 80-acre parcels, three adjoining parcels. And in that application, they wrote that the prior use was agriculture and that part of it has had a gravel pit on it. That's what they wrote. There was opposition from the city, and they withdrew the petition. They knew that the city didn't want this 200, I think it's 240 acres, something like that. They didn't want this there. So what they decided to do was they knew that there was an existing certificate, the one we're disputing, there's a dispute over. And so they decided, let's just buy the 80-acre parcel and not the 240 acres, and let's get an option on it. And then let's find out five years later whether or not that nonconforming use certificate was still valid. So there is a hole dug in this 80 acres, and there is a pile of stock. For you and I, it might look like just a hill, but it's a pile of stock that's extracted from the ground and piled on the property. And it's sat there like that since the 70s. So my clients knew that this was there. They knew that there was an existing certificate applicable to that 80 acres. They knew that the Stig's and the Scott's were now the owners of the property. The Stig's and the Scott's had been involved in different requests for use on that property in different proceedings that my clients were not involved in. They came in and talked about the current use being agriculture and that they wanted to put a church on it. They wanted to run a model airplane club on it, all those things. There's no evidence to show in the record that my clients knew any of this. What they knew was there was a pit and a pile, and they wanted a gravel pit. They wanted to operate a gravel mining facility on this 80 acres. So they go to the county and they ask the county, is this certificate still valid? And the assistant director of the Department of Zoning and Planning or Planning and Zoning says, yes, it is. I'll get you a letter. And she said that a couple of times, and that's in the record. It's established uncontested that those oral statements, assurances of validity were made. So they were facing a deadline to close. They closed. A few days later, they get a letter from the same assistant director that says, and it's so important what she says. The letter says, there's several paragraphs, but the one paragraph that really matters, Since there is a recorded non-conforming use for this property, and the use of storage has not been discontinued, it is the position of the department that the NCU is still valid. She clearly based that decision on the existence of storage still on the property, something that my clients believed to be true. In addition, there was an affidavit of non-conforming use that my clients requested of the current owners that their attorney put together for them, and the current owners signed it. They swore, and this was presented to the ZBA, that there were other uses that had continued, including sale, transfer of material. It's all in the brief. But basically, other uses were continuing. But no one says they're continuing to dig. So clearly, from my client's perspective, they believe that storage has been there since the 70s. So we cite to the court the case of, I think it's the County of DuPage versus Elmhurst-Chicago-Sloan. It's 18-02-479. It's a 1960 case that's never been challenged from the Supreme Court. It basically says mere stockpiling on the property preserves all the uses for a non-conforming use certificate. So if that's true, barring any other facts that may make that untrue, as one of the current owners along the way makes some sort of affirmative act to give up that certificate, to abandon it, and how would my clients know whether or not that was true? So looking at it with the pile still on the property, the assumption is it must be valid. So if that's the assumption, who do you ask? Who do you go to and say, find out? Do you ask the current owners? No. You go to the county. You go to the party, the entity that is responsible for issuing the certificate. It's your certificate. Is it valid? Tell us. If you don't know, say you don't know, and then it's on me. If it's not valid, then it's on me. But if you represent affirmatively that because there's storage, and it's undisputed that that pile has been there since the 70s, is it not reasonable for that party to rely upon the county zoning and planning, planning and zoning, and believe that it's still valid? And their purpose was they needed that certificate in order to operate the gravel facility. So the county says yes, undisputed, undisputed that the county says yes because of storage. It's in the letter. It's not contingent. It isn't if there's continuing storage, it might be valid. It says because there's continuing storage, it is valid. So then what happens? We buy the property, right? We start to prepare the property. We're not ready yet to completely mine the property, but we start doing things. A dispute arises in the county, and there's an interview done of the county director a year later. And I want to correct the citation in the original brief. I know we corrected it in our reply brief, but I want to make sure this is clear. The citation to this newspaper quote, this interview of the director, it's actually found on C-191. I think we cited it as C-1391. I don't know where the three came from except for my big mitts probably. But anyway, on C-191, the director of the department is quoted as saying, at some point it was determined that if general storage, in parentheses, of sand and gravel was still occurring on the lot, then the nonconforming use certificate was valid, and they, FLM, my client, could still continue to operate. If there was no storage on that lot, it may have been very different. So clearly the county's position is based on the presence of storage, not anything else. They wrote it in a letter in August of 2007, and they made an oral statement that was recorded in the newspaper in October of 2008. Evidence of both of those things is before the Zoning Board of Appeals. But what happens? The city of Chillicothe does not want this gravel pit. There are people who are objecting. In fact, Mr. Schroeder wrote two letters to the county in May of 2010, a day or two apart. And they're in the record. They're addressed in both my briefs. He says, hey, they're not supposed to be doing this, because the county wrote a letter after this article that said you may not, it may have been abandoned, and you may be limited to just storage. Well, I have no idea what the legal basis would be for the county to limit, to cut off some of the uses and limit it to only one. You either abandon the certificate or you don't. You either get all the uses or you don't. And that case is Boehner v. Village of Algonquin, I believe. I might have the wrong site there. But the point is the Supreme Court has said if you keep one use ongoing, you don't abandon any of the uses. So I don't know how the county thinks that they abandoned some of them, but they could keep doing storage. But that's what the letter says. Flash forward now again to May of 2010. Mr. Schroeder, on behalf of the city of Chillicothe, writes two letters to the county, and they're in the county's file, when they issued this opinion in 2007. I'm sorry, when they said that. In 2010, he writes two letters. They were in the file, and they're part of the record. The two letters say, we're doing something we're not supposed to be doing. One of the letters encloses pictures of us using heavy equipment to move ground to mine on that property in 2010. The next action by the county is in 2015. It's five years later. They do nothing for five years. When they get to the end of the five-year period, then they start to try and enforce this thing. Two minutes. I'll never get to all of it, but let me skip ahead a little bit. There's a couple of things I really want to hit. Judge Mack, in the record, and I'll give you the page number here in just a second, his ruling is absolutely right until he gets to the end. It really is. I mean, everything he says. FLM can't be imputed with the knowledge that's in the county's file. Correct. He says it's a horrible thing that they did when they told them it was valid, based on what they should have looked at. Correct. When we get to the evidence of the record, what the prior owners knew, there's no evidence in our record to show that FLM knew any of that. Correct. What he gets to at the end, he says because this application says agriculture and it has had a mining on it or a gravel pit on it, that that somehow shows that we acted unreasonably. But the existence of agriculture doesn't- The application, what are you referring to? The prior application for the non-conforming use for the 240 acres. And we cite to that location in the record, Judge. Great question. Because of that time, before they entered into this and before they relied on it, they knew it was being used for agriculture and they knew that there had been a gravel pit on it. How does that establish knowledge of abandonment? Because that's what matters. How does that establish that they knew that this non-conforming use certificate was abandoned and no longer valid? They don't. That's why you go ask the county. Sure, it's got agriculture. And that's the Banner case that says ordinary concepts of use does not apply if future use as mining applies. Well, so the current owners weren't in the gravel pit operation. That's not what they did, right? But they did sell or they did move property. They stored property. Who knew what their future intent was? Nobody knew until- Property being gravel? Correct. Stock. I'm sorry. While this pile of- I'm hurrying. I'm sorry. There's a pile of stock on there, and their non-conforming use affidavit says they sold some of that and they moved some of that and they continued to store it. Did they give something that appears inconsistent in testimony before? Yeah, they did. But how do we know that? We went to them as the current owners. This is the only evidence in the record. We went to them as the current owners and said, Hey, have any of these things on the non-conforming use been ongoing? And they said, Well, sure. Four or five of those things. And I don't think the Scots lied at either time. What they did was when they went to the prior application, they didn't realize that the non-conforming use includes storage. It includes moving that stuff. It includes selling property without digging. So the only thing that wasn't going on at the time was probably digging. From our perspective. And that's why the estoppel should apply. Latches, same concept applies. They knew, the county knew for five years at least that my clients were doing something that they thought was wrong and they did nothing about it. So what did we do? We continued to do those things and we continued to invest in the property. That's a classic case of latches. In the case, the county and the city argued that the county of DuPage versus K-5 construction case doesn't apply here. And I know you get lawyers that come in here, I'll bet, all the time and say, Our case is exactly on point with that. Well, let me tell you, it's not exactly on point. But it's pretty darn close. In that case, the owners of the property that are involved in the case are the ones who abandoned it. And the court found that, yes, you did abandon it. But you're estopped because the county wrote two letters, not even directly to them. They wrote it to other people and copied it to them. And they had notice of the county's opinion at that time that it was still valid. And when the county came back later and tried to change their mind, the court said, No, you're estopped. And indeed, on top of that, latches apply. And if you read the facts in the county of DuPage, the county is going to come up here and argue. They're going to say, Wait a minute. The owner in that case was actually selling property to the county. Sure, that's more. But it doesn't anywhere in there say if the county hadn't been buying that gravel, we would have found differently. Because those letters, because those notices, because those communications were sent, in this case to FLM, in that case to K-5 Construction, and they reasonably relied on that and continued to invest in the property, the county is estopped. Counties should be estopped in these cases. Let me ask you a question. Yes, sir. Is there still mining going on on surrounding properties? Oh, a ton, Judge. If you look at page 14, just north of there, and the testimony is in the record as well, but on page 14 we gave you a little bit of a picture. I wish we would have been able to give you the bigger picture. Because there's 1,000 acres just north, and that's the testimony, about 1,000 acres of mine just to the north, right across the street from us. And above that is an even bigger abandoned mine. It's a huge mining area. I'm talking about active mines. Active? There's 1,000 acres that's active right above us. In fact, the testimony even says, you'll see there's some water. They continue to mine under the water. Is this particular parcel that had the prior use, is there, I think there is mining going on there now. Isn't that the point? Yes. It is being mined now. The 1,000 just north of us was being mined now. What about your part? Well, it's not anymore because when Judge Mack entered his order, we had to stop. But absolutely, we had up until that time, we were preparing to, and at times, taking gravel off. Okay, so the answer is no mining now because of the order. Because of the order, right. And with any luck, after your decision, we might start to do it. Yes, sir. I think it's a smaller episode. Yes, it is. Oh, okay. I'm sorry. I'm sorry. Thank you. Thank you very much. Ms. Manline. May it please the Court, my name is Melinda Manline. I'm here on behalf of the Peoria County Zoning Board of Appeals. I'm also, I'm sharing my time today with the gentleman from Shellac Coffee, so I'm going to try to keep my comments brief and stick to my half. So I'm just going to touch on a couple things. First is the standard of review that is applicable in this case. As Mr. Smanow said, they weren't challenging the abandonment issue because of such the high standard of review that it was manifest way to the evidence. With regards to whether reliance is reasonable, that's typically considered a question of fact as well. Also subject to a manifest way to the evidence standard, which, as he acknowledges, is a very high standard, and it's their burden. If there is any evidence in the record to support the ZBA's finding that the reliance in this case is not reasonable, then their opinion must be upheld by this Court. And we have actually pointed to a number of reasons why there is evidence in the record. But in particular, it hinges in large part on FLM's knowledge, what knowledge they possessed before they went to the Planning and Zoning Department and asked for the opinion. Just a quick overview, because there is a long history and a lot of facts in this case. FLM purchased the property from the Stiegs and the Scotts in 2007. And shortly before purchasing it, they approached the Planning and Zoning Department and asked for an opinion on whether the Nonconforming Use Certificate 370A was still valid. But when they did that, they also brought that affidavit from the Stiegs and the Scotts with them, which Mr. Smanow mentioned. That affidavit said Stiegs and the Scotts had owned it for 14 years. They continued one or more of the nonconforming uses. And importantly, that they never discontinued any of the nonconforming uses. That's what it said, no discontinuation of nonconforming uses. And it was drafted by FLM's attorney. We detail in our brief why we think that that is a very disingenuous affidavit. But FLM, in their reply, said, well, if it was disingenuous, then we were deceived by the Stiegs and the Scotts. There's no way we would have known any of that. But the only way they could have been deceived is if they completely ignored the knowledge they had at the time, like they're asking this Court to do. With regards, the two instances that really show their knowledge prior to this are the 2001 special use application and then the 2002 sales contract, which Mr. Smanow didn't touch on at all. So the 2001 special use application, as he mentioned, they applied for a special use for mineral extraction on three separate properties, three adjoining properties. The subject parcel that we're talking about here today was the westernmost one. And so they wanted to operate a gravel pit on it. As he said, they did say the current use was farming. Proposed use was mineral extraction. That's also what the planning and zoning staff report said. They said current use agricultural and model airplane club, I believe. There's no mention of any active mining, any active storage, any of the special uses. No mention of non-conforming use certificate 370A at all. They are now claiming, certainly in their reply brief, that when they said it has had a gravel pit on it, well, that's past, present tense. So it could mean it was ongoing. We don't know what they meant. But we do. If it had active mining, active storage, if they thought that that was the case when they applied for the special use, they would have said that. That would have been a great argument for why they should expand mining to the two adjacent parcels. And if there was active mining on that property at the time they made the special use, then why would they have ever even included that parcel in the special use? Why would they need it? Apparently it was already actively mined and had a valid non-conforming use. But... What constitutes abandonment? Well, under the Fanning and Zoney, under the ordinance, it's six months of discontinued use. This case law is a little bit different. You need to show an intent to abandon. But the cases that we discussed, Mr. Spanos keeps talking about, you know, if you have as long as one use continues, then it's valid. But that's not what the case law regarding mines shows at all. There are a couple cases saying that if there are adjoining parcels owned by one enterprise, they're actively mining at least one portion of it. Because if you own 80 acres, you're not going to mine all 80 acres. We certainly, at once, we certainly know that. But you might farm a lot of it. And that's what the case law says. So just because you're farming a portion of it and actively mining another place, it's not abandoned. But those cases that they're talking about, there was active mining present in all of them. There were one enterprise, there was active stores, there were all these active things. I think when you get to abandonment is when you just actually aren't using it. In this case, it hadn't been used for these things for 14 years. I mean, intent to abandon. If you haven't been using it at all for a decade, I don't know how that wouldn't be intent to abandon. If you don't remove the storage, have you abandoned it? Well, I think there's a difference between I think it is abandoned storage versus active storage. Whether you're taking things off, putting it back on, just a pile that sat there all the time, is that active storage? Is that actually being used? Or is it more like I think at least in one of our arguments we gave the example of a building that was used as a restaurant at one time. Then they stopped operating the restaurant. The building sits there. It's decrepit. It's not being used. It's abandoned. You wouldn't say, well, that building's been there for 15 years, so it's still being used as a restaurant. There's no active storage, and I think that's really where it comes into play. And if you look at the 2002 sales contract, they entered into a contract with the Steaks and the Scots in 2002. It was a five-year contract for purchase of the property. And that's where you really get FOM and have the knowledge that, in fact, the Steaks and the Scots were not using any storage. The sellers in that contract retained two uses, two uses only for the property. They retained the right to farm it, and they retained the right for the model airplane hub to operate it. They did not retain the right to use the property for any of the nonconforming uses, not even storage, not the sales that they planned happened. None of that was retained. So FLM knew for five years before going to the Planning and Zoning Department that the Steaks and the Scots hadn't had a right to use the property for any of the nonconforming uses. And that's knowledge that, at the time that they approached Planning and Zoning, only they knew that. Planning and Zoning, there's no evidence on the record that Planning and Zoning knew about this 2002 contract and the substance of it. When you're talking about rights, it's contractual rights. Yes. Not rights pursuant to a permit. Right, right. But for the contractual rights, they did not have a contractual right to use that property for five years prior to the purchase for a single one of the nonconforming uses in the certificate. And yet knowing that, FLM drafted and presented an affidavit to Planning and Zoning saying, hey, none of these have been discontinued. They've been ongoing for 14 years. But they knew it hadn't for five. If they had been honest, if they had been acting with keen hands, they would have gone to Planning and Zoning and said, well, we know this hasn't been used for any of these for the last five years. Is it still valid? But they didn't do that. They brought an affidavit, and they asked for the opinion. And so that's why they couldn't have reasonably relied, because the opinion took into account this affidavit, what the sellers were saying, what the owners were saying. They couldn't reasonably rely on an opinion that they knew was based on false information. They can't have obtained equitable relief, the latches and the estoppel that they're asking for, if they acted with unclean hands by presenting that false information to the Planning and Zoning Department. And what is the significance of the fact that it was recorded, that the certificate was recorded? The nonconforming use certificate? Yeah. That's to put future owners on notice that it's there. I don't know that anyone's talked about that to date. So they would have been on notice that it's there, and if they wanted to use it, they would have. I think the fact that, again, they – and the five-year contract, the Stig's and the Scott's, as the FLN knew, that they chose not to use it for that, they did not retain the right to operate under the nonconforming use for five years. And so that shows that they should have had knowledge of it, and that they chose not to use it, and they chose not to retain those rights. They abandoned it. Do we know who recorded that permit? I do not know. We'll look into it. Thank you, Mr. Madeline and Mr. Schroeder. May it please the Court, Your Honors. Attorney Madeline, Attorney Katz. My name is Dan Schroeder, and I represent the people of the city of Chillicothe, Illinois. I'm not going to go over old ground that's already been gone over by Attorney Madeline. I want to emphasize a couple of things that are important to the review of this situation, and it's imperative that you understand this is a unique situation that will never arise – I can assure you will never arise again, will never come before this Court or probably any court in the state of Illinois because of that nonconforming use certificate. Let's start there. In 1965, McGrath, Sand & Gravel purchased the property, and in 1974 obtained this nonconforming use certificate. Now, this predated the current zoning code that the Peoria County has, so it was grandfathered in, so we've got to play by whatever the rules were for this nonconforming use. The nonconforming use certificate very clearly said that it was only as good as until the use on the property was abandoned for a period of six months, and once that was done, it can't come back. Now, Attorney Spanoff says we're conceding the fact that that was abandoned. We're not arguing that anymore. Well, it's convenient for him and his argument to simplify things by saying that, but what the Court needs to understand is that abandonment issue was a thread that is woven throughout the entire case. It's woven into the issue of latches. It's woven into equity estoppel because everybody thought that the use had been abandoned. Obviously, there was a test pile of gravel that was taken out and left there, and there was testimony at the hearing by a general manager of another gravel company that it was his understanding that the original owner had abandoned any mining activity or an intent to do any mining activity on that 80 acres because of the hue and cry that would have been brought up by the city of Chillicothe and the citizens of Chillicothe. We now know that, in fact, in 1983, the local savings and loan formed a subcorporation called Area Growth Corporation, and the Area Growth Corporation purchased the property, the 80 acres, for the specific purpose of taking it out of play. We're going to take this property and we're going to maybe develop it for residential purposes, but we sure as heck don't want it to be used for a gravel pit, so we're going to buy it. We're going to abandon the use. We intend not to do anything else with it but residential use and development at the best. Now, did we know that at the time that all these events were taking place with the zoning department and opinions were being made? Everybody suspected it, but the zoning department can only do, can only render an opinion on what's in the file at the time. We now know, as Attorney Spanos admits, we have a 1915 affidavit by the former president of Area Growth Corporation. He says, yeah, if anybody didn't know it, yeah, we bought it and had it for 10 years and took it out of play. But did the 1915 affidavit make it into the file in 2007 when Attorney Spanos' clients are going to the zoning department and asking, is there any reason we can't mine on that property? Something else that's important to note is not only in regard to two things. Number one, you heard mention of the fact that Attorney Spanos' clients went and asked for a, applied for a special use permit for this 80 acres in addition to another tract of property. At that time, there was never any mention made of the fact that they didn't believe that the special use permit wasn't intact. I mean, the fact of the matter is, as Attorney Manline says, if they really believed that the special use certificate was still in place and there was still active mining going on there, why would they have included that 80 acres with their petition for special use and have to go through the reviewing process? That doesn't make any sense. They knew, they suspected, these are sophisticated business people now. This isn't just Gomer next door. These people understood that there was a risk here. So what did they do? What they did was they decided, let's, you know, the Stig's and the Scott's bought this property. Let me go back in my timeline. The area growth corporation owned it for 10 years. Then the savings and loan fallout took place. They had to get rid of it. So they sold it to the Stig's and the Scott's. What year is that? 1994, I believe it was. 1993. Okay. So 10 years later. Well, the Scott's and the Stig's came in for a special use permit. And they said, we wanted to fly model airplanes on it. And in that testimony, Mr. Stig's says, we don't have any intention of ever mining this thing. We don't want to mine it. In fact, all we want to do is fly airplanes on it. And, in fact, that pile of gravel over there, that's a nuisance. Kids are running up and down it on their bikes. There's needles out there. People are coming out here and partying. I intend to tear that down and use that gravel as a parking lot for the people who are going to use this as a model airplane. Is there actually testimony on that? Yes. Okay. Yes, it's in the record. It's in the record. So now we come to Mr. Spanoff's client, who is interested in buying the property. In 2002, they enter into a five-year contract. It gives them a five-year option to buy the property. So what happens is that they decide as they get closer and closer to the deadline, and now they're right up against it. Well, what do we do? We have to make an educated decision here. What do we do? Are we going to roll the dice and buy this property, knowing that there's no bright line for if the property had been previously abandoned or not? You don't publish it. There was never anything said that it had to be published in the paper or somebody rings a bell or you post notice or anything like this. There's always the possibility that they were buying this property with all of its rewards, that at some point somebody was going to come forward like Area Growth Corporation's president did in 2015 and say, I can establish that it had been previously abandoned. They didn't want to take that risk. They didn't want to necessarily take that risk. So what they did was they got their law firm, the FLM's attorneys, drafted this affidavit that flew in the face, directly in the face of what Mr. Stiga testified to earlier and says, oh, yeah, for 14 years we've owned the property, the Stigas and the Scotts. We mined it. I mean, we've got one or more of these, all these mining uses, and we've never got rid of any of them. So what do they do? They take that into the zoning department and they plot that down on the desk and they go, well, there you go, for 14 years. We've established a lease for the last 14 years. There's been no abandonment. Couldn't that affidavit be true and still not negate the fact that it was abandoned by somebody before? I mean, they may have mined it improperly. Well, except that the appellee brief also says that in the testimony at the Zoning Board of Appeals, there was also testimony that, and this is because the city of Chillicothe got involved, one of my associates got a hold of Mr. Stiga and said, hey, you filed an affidavit saying you mined this thing for 14 years. Let's just forget whether it's an accurate affidavit or not. Was it the property that Special Use abandoned long before? Yes. So it doesn't really matter what they did. Well, it does from the standpoint of what the FLM is being told by the county. The county wasn't aware. I understand your argument. The county wasn't aware. They didn't have that benefit of that affidavit until 2015. There was always rumors. There was always suspicion. But what's in the file? And that's all Mary Lou Lauder could go on was what was in the file. What was in the file? Well, you had an affidavit that had been prepared by FLM that said we've been mining it for 14 years, and we've never abandoned any of that. So what if it was abandoned by a previous owner? Right. But I'm saying without knowing that, and you're asking her to render an opinion, she does. And what's interesting is every letter that's issued has the same conditional language, and so did this one. And that's the most important thing of all. He talks about her letter. Her letter then goes on to say, however, if there had been any abandonment of the mining use for six months or more, then the nonconforming use expired. So I'm telling you based on what I see in my file, it's possible the nonconforming use certificate is still in effect. But I'm also telling you, conditionally, if we find out that it has been abandoned for six months or more, the nonconforming use certificate is no more. And, in fact, it was no more. And she was right to tell them that. They knew that. They knew that when they presented that affidavit to try to convince her that there had been, at least for the last 14 years, mining activity that took place on the property, when, in fact, it never had. And Mr. Steed came in later on and said so. Where did the trial judge say about that? Pardon me? Where did the trial judge say about that issue? He used, I think, about that issue, meaning what? About what you're talking about now in terms of the affidavit versus the allowance. What he said was, I think he lumped it in with the testimony that related to the activities of FLM up to that point and including the affidavit, and that was that it was difficult for him not to believe that they were aware that the nonconforming use certificate had been abandoned prior to that. And that was really what he felt was, when it came to knowledge, they had knowledge that it was likely that the nonconforming use certificate had been abandoned. Hence, that's why they decided that if they're going to roll the dice, they're going to tilt the table in their favor by doing this affidavit, and that's exactly what they did. And I think that's exactly what the trial court felt, and as I recall, that was what the trial court ruled was they can't escape the fact that they had to have some knowledge of the fact that the nonconforming use had been abandoned, either with their people, meaning the Steeds and the Scotts, or by Area Growth Corporation. Thank you. Thank you, Mr. Chairman. Mr. Spannis, any rebuttal? Thank you, Your Honor. I'd like to start with that last additional question. That's absolutely false. That is not what the trial court found. The trial court specifically found that you cannot impute the knowledge of what was in the county's records or what was in the Steeds' or Scotts' prior testimony, what they knew to FLM. He didn't say that anything with respect to Steeds or Scotts created some sort of knowledge of abandonment. What he said at the end of the day was because they knew that there had been or has been a gravel pit on the property and because they knew it was being used for agriculture, those were the two things that he relied upon. The fact of the matter is, is that just as the court points out with respect to the affidavit, I lost that first slide. I'll come back to it. I want to first address a couple of issues that Ms. Manline raised. The arguments that she's making about the case law and the fact that that's not what the case says and it was a gravel operation who buys land and doesn't use it, the county rejected all that argument when they said it was valid. The county didn't rely upon the affidavit that there were other uses going on. The county relied on only one thing, that there was continuing storage on the property. That's it. The letters, I read those both to you. The letter and the public statement, that's all they relied upon. By their own admission and the letter as characterized by Mr. Schroeder is not accurate. He says, but if, however, it doesn't say that in the letter. The best it says in any letter is that if it's been abandoned more than six months, it's no good anymore. And that's true. Nobody disputes that. The letter actually comes back and says, since there's been storage ongoing, the non-conforming use is valid. So put yourselves in the shoes of FLM when they're coming. They want to know the answer. There is a recorded valid certificate of non-conforming use, right? It's recorded. It's with the county. Is that still good? So who do you go ask? You go ask the department. And the department now wants to take its records, things that were in its possession at the time that they gave the answer, and impute somehow knowledge to my clients that they should have known what was in the department's records. Well, if the department didn't know what was in their records, they should have said, I don't know. We don't know. You're on your own. Or they should have said no. But they didn't. They said it's valid. What is abandonment? How do you establish it? Well, they have to make some affirmative act. If I recall the case law correctly, and I've read a lot of it, it's not just simply stopping. There's got to be some affirmative intention to abandon. How is my client to know what the intention of any of those prior landowners were, other than to talk to the ones they could put their hands on? Even the county didn't know that Fissler, who was the president of this savings and loan that went south back in the savings and loan crisis in the 80s, probably because they're buying property for the sole purpose of abandoning, not conforming uses. But the reality is this affidavit doesn't come around until 2015. He said 1915. He was mistaken. It's 2015 or 14. So the county didn't know what Fissler was going to say. Fissler just accomplished what the people of the city of Chillicothe were trying to do for 20 years, and that is try and stop this gravel facility. So the council also said that we concede that it was abandoned. Two issues on that. Very important. One, we don't concede that. We don't think there was an abandonment, but we recognize that we probably can't win that in the face of the affidavit. That's what I'm saying. And the second thing that's probably the most important thing, and this goes to the question Judge Wright asked that I was thinking about, he asked about the abandonment issue and does it matter. And my thought is it doesn't matter. If you look at that K-5 case, in that case the court decided it was abandoned. And not only was it abandoned, it was abandoned by the same people who were in there trying to say, hey, wait a minute. Estoppel, we relied on you. And the court says, well, you did abandon it, but because of those subsequent communications, you're subject to Estoppel. You win on Estoppel. You win on latches because you relied on those letters. And that's what I'm getting at here. Whether it's abandoned or not is a red herring. It's smoke and mirrors that both counsel continue to throw out there with respect to the Estoppel argument. The only issue on the Estoppel is did they act reasonably. And the standard for reasonableness on reasonableness, and I'll end with this if you just give me just a minute. A mixed question of law and facts exists when the facts are admitted or established and with respect to Estoppel. They are admitted or established. There's no question. The law is undisputed. We know what the law is on Estoppel. That's undisputed. And the issue is whether the facts satisfy the statutory standard or whether the rule of law is applied to the historical facts is or is not violated. So what you need to do, I think, is you look at the established facts. There's no question what the facts are. And does this amount to Estoppel? And with respect to reasonableness, the cases say normally a question of fact. A court can determine whether the reliance was reasonable as a matter of law when no trier of fact could find that it was unreasonable to rely on the alleged statements or when only one conclusion can be drawn. One last sentence, please. Counsel, I'm sorry. Your Honors, there is nothing more reasonable when you're looking to find out the validity of a license or a certificate than to go to the party that issued that certificate or license and ask them, is this still valid? That's what they did. That's what happened here. And they relied reasonably. I have one point of clarification. I think I know the answer. Are you reviewing the Zoning Board's decision or the Circuit Court's decision? I think it's the Zoning Board's decision. So the Circuit Court's determination, findings of fact, and analysis of the law is still relevant? Is that your position? You know, I don't know the answer. Did the Zoning Board reach the legis argument? I don't think they ever did. I think they just dismissed it. Okay. I don't remember, to be honest with you, Judge. My recollection is there's nothing in there about the latches other than them simply dismissing it. I'm sorry. Thank you for your time and indulgence. I appreciate it. Thank you, Mr. Spanis. Thank you all for your argument today. The rest of this matter under advisement. It passes the written decision. Thank you.